UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LORETTA BRADY, as Attorney-in-Fact for LOTTIE SMITH, <br><br> Plaintiff, <br><br> v. <br><br> SSC WESTCHESTER OPERATING COMPANY LLC, a Foreign Limited Liability Company d/b/a WESTCHESTER HEALTH AND REHABILITATION CENTER, <br><br> Defendant. <br><br> and <br><br> EILEEN B. WALSH, as Independent Administrator for the Estate of RITA SAUNDERS, <br><br> Plaintiff, <br><br> v. <br><br> SSC WESTCHESTER OPERATING COMPANY LLC, a Foreign Limited Liability Company d/b/a WESTCHESTER HEALTH AND REHABILITATION CENTER, <br><br> Defendant. | No. 20 CV 4500 and <br> No. 20 CV 4505 <br><br> Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

Lottie Smith and Rita Saunders, residents of a nursing home owned by defendant SSC Westchester Operating Company, both contracted COVID-19 in the early days of the pandemic. Smith recovered, but Saunders did not. Smith's daughter, plaintiff Loretta Brady, sues Westchester as her mother's attorney-in-fact, and

Saunders's sister, plaintiff Eileen Walsh, sues Westchester on behalf of Saunders's estate. Brady and Walsh allege that Westchester violated the Illinois Nursing Home Care Act by knowingly exposing its residents to nursing staff who had tested positive for, or were displaying symptoms of, COVID-19, and failing to provide the nursing staff with personal protective equipment during March 2020. Brady also alleges that Westchester caused her mother to suffer a series of non-COVID-related injuries. Westchester moves to dismiss both complaints for failure to state a claim and to strike allegations in the complaints. For the reasons that follow, Westchester's motions to dismiss are denied, and its motions to strike are denied in part, granted in part.

## I. Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, I construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Calderone v. City of Chicago*, 979 F.3d 1156, 1161 (7th Cir. 2020). In resolving a 12(b)(6) motion, I may consider allegations in the complaint, documents attached to the complaint, documents that are both referred to in the complaint and central to its claims, and information that is subject to proper judicial notice. *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

## II.  Background[1]

Lottie Smith and Rita Saunders lived at Westchester Health and Rehabilitation Center, a long-term care facility. [1-1] ¶ 6; Dkt. 20-cv-4505, [1-1] ¶ 6. Between 2011 and 2019, the Illinois Department of Public Health cited Westchester 10 times for violating infection control procedures, such as hand hygiene and maintaining equipment to help prevent the spread of infection. [1-1] ¶¶ 77–84.

In November 2018, Smith, who required assistance with daily tasks like transfers, turning, and using the bathroom, fell and hit her head, requiring hospitalization. [1-1] ¶¶ 99, 103. She fell a second time the next month, again hitting her head. [1-1] ¶ 104. In February 2019, Smith developed an ulcer as a result of Westchester's failure to provide continence care, offloading, and turning and repositioning. [1-1] ¶ 105. Brady complained to IDPH about Westchester, prompting IDPH to conduct a site visit. [1-1] ¶¶ 106–07. Westchester found out Smith and her daughter had filed the complaint. [1-1] ¶ 108. In January 2020, Westchester staff didn't shower Smith for eight days, so she contracted a fungal infection that required antibiotic medication and treatments. [1-1] ¶ 109.

Between January and March 2020, the public began to learn about the COVID-19 pandemic. [1-1] ¶¶ 38–76. On January 24, a Chicago resident was confirmed to have the virus. [1-1] ¶ 44. On January 30, the World Health Organization declared

---

[1] Brady and Walsh each brought their own lawsuit, but their complaints bring the same claims and allege substantially the same facts, and Westchester makes identical arguments for dismissal. So I consider the motions together. Unless otherwise noted, bracketed numbers refer to entries in Brady's case, District Court Docket Number 20-cv-4500. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. Facts are taken from the complaints. *See* [1-1]; Dkt. 20-cv-4505, [1-1].

the outbreak an international public health emergency. [1-1] ¶ 45. By February 28, a resident of a nursing home in Washington State had the virus. [1-1] ¶ 49. On March 4, the Administrator for the Centers for Medicare and Medicaid Services directed all healthcare providers to review their infection-control procedures. [1-1] ¶ 52. On March 9, the Governor of Illinois issued a disaster proclamation and executive order. [1-1] ¶ 53. That same day, CMS updated its COVID-19 guidance and advised that anyone experiencing signs of a respiratory infection while at work should stop work, put on a face mask, and isolate at home, among other things. [1-1] ¶ 54. On March 13, CMS provided guidance for infection control and prevention in nursing homes. [1-1] ¶ 57. Its memo directed homes to isolate potentially infected residents; screen all staff for symptoms at the beginning of each shift and, if anyone had symptoms, direct them to self-isolate at home; identify and restrict staff that worked at multiple facilities; and obtain supplies as soon as possible. [1-1] ¶ 57. On March 17, IDPH confirmed that multiple residents and staff at a Chicago-area nursing home had tested positive for COVID-19. [1-1] ¶ 60. That day, IDPH issued updated guidance for nursing homes; it recommended, among other things, that homes screen residents and staff for fever and respiratory systems. [1-1] ¶ 61.

On March 9, members of Westchester's nursing staff told nursing supervisors and the facility's administration that nurses were experiencing COVID-19 symptoms. [1-1] ¶ 111; Dkt. 20-cv-4505, [1-1] ¶ 92. Over the next few days, two members of the nursing staff reported testing positive for COVID-19 to Westchester management, including one nursing assistant who also worked at another nursing home that was

4

experiencing an outbreak. [1-1] ¶¶ 117–18; Dkt. 20-cv-4505, [1-1] ¶¶ 100, 102. Over the following few weeks, some nurses reported feeling sick to Westchester management. [1-1] ¶ 115. Westchester told its nursing staff, including those who had tested positive and the nursing assistant who worked in another facility, to continue reporting to work and caring for residents. [1-1] ¶¶ 112, 117–18; Dkt. 20-cv-4505, [1-1] ¶ 94. Another member of the nursing staff reported feeling sick and, when that person left the home to quarantine, Westchester fired them. [1-1] ¶ 119.

At some point in March, a member of the nursing staff reported to management that there were no personal protective masks in the facility's storage closet. [1-1] ¶ 136. Westchester did not provide its nursing staff or employees personal protective equipment at any point that month, including masks, gowns, or face shields. [1-1] ¶ 138.

On March 11, Saunders's medical chart reflected that she was asymptomatic. Dkt. 20-cv-4505, [1-1] ¶ 98. Three days later, a nurse wrote, "MD notified with orders to obtain stat chest xray." Dkt. 20-cv-4505, [1-1] ¶ 101. Around that time, Saunders told her doctors and family that she had developed a dry cough and shortness of breath, and complained of "generalized body pain." Dkt. 20-cv-4505, [1-1] ¶¶ 103–04. On March 20, Saunders asked Westchester for a COVID-19 test; Westchester refused, and told Saunders she did not have the virus. Dkt. 20-cv-4505, [1-1] ¶¶ 105–06. Three days later, Saunders's condition worsened, and she was hospitalized and diagnosed with acute hypoxia and respiratory failure. Dkt. 20-cv-4505, [1-1] ¶ 108. She died about a week later. Dkt. 20-cv-4505, [1-1] ¶ 112.

Smith, meanwhile, began to experience a dry cough, shortness of breath, sore throat, loss of appetite, and a high fever on March 20, and was hospitalized a few days later. [1-1] ¶¶ 2, 120–22. By March 27, at least 26 residents of the home had tested positive. [1-1] ¶ 123. By April 19, 43 residents had tested positive, and nine residents had died. [1-1] ¶ 139. By June 21, 44 residents had contracted COVID-19 and 12 had died. [1-1] ¶ 141.

Brady alleges that members of the Westchester nursing staff told other employees to "let" Smith fall so she would be discharged from the center. [1-1] ¶ 124. In late April, Smith fell and hit her head, causing a seizure. [1-1] ¶ 125. The next month, Smith fell four times. [1-1] ¶¶ 126–30. In June, the center administrator threatened to discharge Smith because Brady had complained to her mother, other residents, IDPH, and the media about abuse and neglect that she had observed at the home. [1-1] ¶¶ 132–34.

### III. Analysis

Brady and Walsh bring alternative claims for negligence and willful and wanton misconduct under the Illinois Nursing Home Care Act.[2] Westchester argues that plaintiffs have failed to state a claim. It argues that the governor's executive orders confer immunity for negligence, so plaintiffs' negligence claims must be

---

[2] The court has subject-matter jurisdiction over these state-law claims. *See* 28 U.S.C. § 1332. Defendant is an LLC. [1] ¶ 6. Its sole member is SSC Special Holdings, LLC, whose sole member is Special Holdings Parents Holdco, LLC, whose sole member is SavaSeniorCare, LLC, whose sole member is Proto Equity Holdings, LLC. [1] ¶¶ 6–10. The sole member of Proto Equity Holdings, LLC is Terpax, Inc., a corporation incorporated in Delaware with its principal place of business in Georgia. [1] ¶ 11. Brady, Smith, and Walsh are all citizens of Illinois. [1] ¶ 2; Dkt. 20-cv-4505, [1] ¶ 2. The amount in controversy in each suit exceeds $75,000. [1] ¶ 5; Dkt. 20-cv-4505, [1] ¶ 5.

dismissed, and that the Act does not create liability for "willful and wanton" conduct. Alternatively, Westchester argues that plaintiffs haven't sufficiently alleged willful misconduct. It also moves to strike some allegations in both complaints.

A. *Failure to State a Claim*

The purpose of the Illinois Nursing Home Care Act is to protect nursing home residents from inadequate, improper, and degrading treatment. *Lakewood Nursing & Rehab. Ctr., LLC v. Dep't of Pub. Health*, 2019 IL 124019, ¶ 20. To that end, the Act creates a regulatory scheme "to safeguard against abuse and neglect of residents." *Id.* It includes a residents' bill of rights, guaranteeing nursing home residents the rights to be free from abuse and neglect. *Id.*; *Childs v. Pinnacle Health Care, LLC*, 399 Ill.App.3d 167, 180 (2d Dist. 2010); *see* 210 ILCS § 45/2-107. The Act defines abuse as physical injury, mental injury, or sexual assault. 210 ILCS § 45/1-103. Neglect means a facility's failing to provide, among other things, "adequate medical care," "personal care," or "assistance with activities of daily living." *Id.* § 45/1-117.

The statute creates a cause of action for nursing home residents to sue facility owners for "any intentional or negligent" act or omission of their employees or agents, and it authorizes plaintiffs to obtain actual damages, declaratory relief, and injunctive relief. 210 ILCS § 45/3-601–03; *Fisher v. Lexington Health Care, Inc.*, 188 Ill.2d 455, 461 (1999); *Sablik v. Cty. of De Kalb*, 2019 IL App (2d) 190293, ¶ 11. The Act does not impose liability on individual employees. *Sablik*, 2019 IL App (2d) 190293, ¶ 11. It doesn't expressly provide for punitive damages, but a nursing home resident may recover common-law punitive damages upon a showing of "willful and

7

wanton misconduct." *Crittenden v. Cook Cty. Comm'n of Hum. Rts.*, 2013 IL 114876, ¶ 20. The right to recover punitive damages under the Act, however, "is lost once the injured party has died." *See Vincent v. Alden-Park Strathmoor, Inc.*, 241 Ill.2d 495, 507 (2011).

Setting aside for the moment plaintiffs' allegations regarding COVID spread, Brady has stated a claim for negligence. To bring a negligence claim under the Nursing Home Care Act, she must allege that Westchester breached a duty and proximately caused Smith's injury. *Myers v. Heritage Enters., Inc.*, 354 Ill.App.3d 241, 244 (4th Dist. 2004). Nursing homes owe a duty of care to their residents. *Stearns v. Ridge Amb. Serv., Inc.*, 2015 IL App (2d) 140908, ¶ 18. Brady alleges that the facility allowed Smith to fall twice in 2018, once requiring hospitalization; failed to adequately reposition her and provide her continence care, causing her to develop an ulcer; withheld a shower for eight days, leading to a fungal infection; intentionally let her fall four times over the course of a month; and threatened to discharge her in retaliation for Brady complaining about her mother's treatment. Brady has adequately alleged that Westchester failed to exercise reasonable care in treating her mother by allowing Smith to fall multiple times and neglecting her hygiene and personal-care needs. And she plausibly alleges that those acts caused injuries—a seizure, a fungal infection, and an ulcer, to name a few. Taking all allegations in the complaint as true, Brady has plausibly alleged negligence (at least) under the Nursing Home Care Act. *See, e.g.*, *Parker v. Ill. Masonic Warren Barr Pavilion*, 299 Ill.App.3d 495, 501 (1st Dist. 1998) (upholding jury verdict against nursing home for

8

negligence where plaintiff was allowed to fall twice). Westchester does not address any of Brady's non-COVID-related allegations in its motion to dismiss or reply brief. So Brady has stated a negligence claim.

For reasons discussed in more detail below, both plaintiffs have plausibly alleged that Westchester was negligent in its care for residents through its handling of COVID-19. Westchester doesn't challenge the sufficiency of plaintiffs' negligence allegations, but argues that gubernatorial executive orders immunize it for the alleged conduct. On March 9, the governor declared the pandemic a disaster under section 7 of the Illinois Emergency Management Agency Act, 20 ILCS § 3305/7. [13-2] at 3. That provision authorizes the governor to declare that a disaster exists and exercise emergency powers for 30 days. 20 ILCS § 3305/7. There's no limit to how many times a governor may renew the disaster proclamation, and the governor renewed it on April 1, April 30, May 29, and after. *Fox Tire Tavern, LLC v. Pritzker*, 2020 IL App (2d) 200623, ¶ 4. Section 21(c) of the Emergency Management Agency Act provides that any "private person, firm or corporation" who renders "assistance or advice at the request of the State" during a disaster shall not be civilly liable for causing death or injury to any person "except in the event of willful misconduct." 20 ILCS § 3305/21(c).

On April 1, the governor issued Executive Order 2020-19.[3] That order defined the term "Health Care Facility" to include facilities licensed, certified, or approved by

---

[3] Westchester attached this executive order to its motions and I consider it even though it's outside the pleadings. Plaintiffs reference other executive orders in their complaints, [1-1] ¶ 53 (March 9 executive order); [1-1] ¶ 70 (May 13 executive order); they don't object to the

any state agency and covered by Ill. Admin. Code tit. 77 § 1130.215(a)-(f). [13-5] at 3. That list includes "long term care facilities licensed under the Nursing Home Care Act." Ill. Admin. Code tit. 77 § 1130.215(c). The governor ordered all healthcare facilities to "render assistance" in support of the state's response to the pandemic, including increasing the number of beds, preserving personal protective equipment, or taking necessary steps to prepare to treat patients with COVID-19. [13-5] at 3–4. Section 3 of the executive order declared, pursuant to § 21(b)-(c) of the Emergency Management Agency Act, that healthcare facilities "shall be immune from civil liability for any injury or death alleged to have been caused by any act or omission by the Health Care Facility" if the injury or death occurred while the facility was "rendering assistance to the State by providing health care services in response to the COVID-19 outbreak." [13-5] at 4. The order excepted from immunity injuries caused by a private facility's "willful misconduct" under 20 ILCS § 3305/21(c). [13-5] at 4.[4]

---

court considering any executive order; and they attach the May 13 order as an exhibit to their response briefs. *See* [25] at 22. Though plaintiffs don't attach or reference the April 1 executive order, which is the one that first outlined the immunity provision at issue here, all of the governor's executive orders are central to plaintiffs' claims. And the May 13 order contains the same civil liability provisions for healthcare facilities as the April 1 order. *See* [13-5] at 1–7; [25] at 26. Further, a court may take judicial notice of public records not subject to reasonable dispute. *Tobey v. Chibucos*, 890 F.3d 634, 647–48 (7th Cir. 2018). Plaintiffs don't dispute the substance of the executive orders.

[4] The Illinois Emergency Management Agency Act contains two immunity provisions. In § 3305/15, the Act immunizes "the Governor, the Director, the Principal Executive Officer of a political subdivision," and their agents, employees, or representatives, from civil liability for injuries caused in response to a disaster, except in cases of "gross negligence or willful misconduct." 20 ILCS § 3305/15. In § 3305/21, titled "No Private Liability," the Act confers similar immunity on "[a]ny private person, firm, or corporation" except in cases of "willful misconduct." 20 ILCS § 3305/21(c). The governor's executive order excepts from liability injuries caused by "gross negligence or willful misconduct … if 20 ILCS 3305/15 is applicable" or "willful misconduct, if 20 ILCS 3305/21 is applicable." [13-5] at 4. Both parties reference the "gross negligence" standard in their briefs, but one reading of the Emergency

A plaintiff need not anticipate and plead around affirmative defenses in a complaint. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). Because "an immunity defense usually depends on the facts of the case," dismissal at the pleading stage on immunity grounds is usually inappropriate. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) (quoting *Alvarado v. Litscher,* 267 F.3d 648, 651–52 (7th Cir. 2001)). So a complaint will not be dismissed based on immunity unless the plaintiff has unambiguously pleaded all the elements of the affirmative defense. *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019).[5]

Plaintiffs' complaints don't conclusively establish that immunity applies. There are outstanding factual issues to resolve. For example, the executive order protects healthcare facilities from liability for death or injuries that occur while the facility "was engaged in the course of rendering assistance to the State" by "providing health care services in response to the COVID-19 outbreak." [13-5] at 4. Plaintiffs' claim is that Westchester failed to protect its residents from infected nursing staff spreading the virus. There's a difference between allowing the virus to spread by taking no preventative measures, and spreading the virus while affirmatively treating it or trying to prevent spread. Only the latter is immunized, and it's not clear from the complaints that the staff infected the residents in the course of providing

---

Management Agency Act and the executive order is that only a government-run facility may be liable for gross negligence, whereas a plaintiff bringing a claim against a private facility must show the facility committed "willful misconduct" to avoid immunity. Regardless, plaintiffs have plausibly alleged sufficient conduct to meet the willful misconduct threshold for the reasons stated in the text.

[5] Plaintiffs label Westchester's argument as "preemption," but I take Westchester to be advancing an immunity defense.

11

COVID-related treatment—it's just as reasonable of an inference that transmission occurred during routine, non-COVID-related care.

Immunity notwithstanding, plaintiffs' claims survive because they have plausibly alleged that Westchester engaged in willful misconduct, a term synonymous with willful and wanton conduct. Willful and wanton conduct is an "aggravated form of negligence" in Illinois, defined as conduct undertaken with a "deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Jane Doe-3 v. McLean Cty. Unit Dist. No. 5 Bd. of Dirs.*, 2012 IL 112479, ¶ 19. Conscious disregard can include the "failure to take reasonable precautions after 'knowledge of impending danger.'" *Papadakis v. Fitness 19 IL 116, LLC*, 2018 IL App (1st) 170388, ¶ 23 (quoting *Barr v. Cunningham*, 2017 IL 120751, ¶ 20).

Taking the allegations in plaintiffs' complaints as true, Westchester knew about the risks of exposing its residents to infected nursing staff by mid-March, when Smith and Saunders began to experience symptoms. Chicago had COVID cases as early as January, and by the end of February, a nursing home in Washington State had reported a resident with the virus. Westchester was on notice at that point that the virus could easily spread in a communal living setting if precautions weren't taken. The Centers for Medicare and Medicaid Services told nursing homes in mid-March to screen staff for symptoms at the beginning of their shifts, send anyone who felt ill to isolate at home, restrict staff who worked at multiple facilities, and obtain personal protective equipment. So Westchester knew that if a staff member reported feeling sick, the recommended response was to send that person home to isolate. Yet

12

when nurses and nursing assistants—including a staff member who worked at another nursing home with a COVID outbreak—told management that they had tested positive for, or were experiencing symptoms of, COVID-19, Westchester told them to continue reporting to work and caring for residents. Plaintiffs also allege that Westchester didn't provide any personal protective equipment to its staff or employees during the month of March, meaning that infected staff were interacting with residents without masks or any other protective gear on. So plaintiffs have sufficiently alleged that Westchester consciously disregarded the risk to its residents when it knowingly exposed them to infected staff members who had no personal protective equipment. Further, plaintiffs' allegations that IDPH repeatedly cited Westchester for having poor infection prevention measures in the years leading up to the pandemic suggest that Westchester had a history of deviating from the standard of care when it came to infection control and prevention. Drawing all inferences in plaintiffs' favor, the complaints plausibly allege that Westchester failed to take reasonable preventative measures, despite knowing the risks.

Westchester pleads ignorance, insisting that it couldn't have known the symptoms of COVID so early in the pandemic. But the complaints plausibly allege otherwise. Regardless of symptoms, at least two members of the nursing staff tested positive for the virus, so Westchester objectively knew that members of its staff were carrying it. And plaintiffs sufficiently allege that official guidance by mid-March listed symptoms of a respiratory infection—e.g., fever, cough, shortness of breath, or sore throat—as signs of the virus. [1-1] ¶ 57. At least some symptoms were widely

13

known by early to mid-March, and plaintiffs don't need to say at this stage of the case exactly which symptoms any given nurse or nursing assistant was experiencing or when—it's enough that virus symptoms were recognizable, Westchester's staff reported those symptoms to management, and Westchester required its staff to come to work anyway. Plaintiffs' claims for willful misconduct are plausible.

Westchester's remaining arguments are unpersuasive. Westchester takes issue with plaintiffs pleading two counts that rely on the same set of facts, since plaintiffs call the nursing home's behavior in count one negligence and in count two willful and wanton. But a plaintiff "need not plead legal theories in her complaint." *King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014). Plaintiffs don't need to commit to a legal theory at this stage of the case—they only need to plead sufficient facts to state a claim under the Act.

Westchester's argument that the Nursing Home Care Act doesn't create a cause of action for "willful and wanton" conduct is wrong. The Act creates liability for nursing homes' "intentional or negligent" conduct. 210 ILCS § 45/3-601. As Westchester reads the statute, willful misconduct is distinct from intentional or negligent conduct. But "[t]here is no separate, independent tort of willful and wanton conduct" in Illinois. *Jane Doe-3*, 2012 IL 112479, ¶ 19. Willful conduct is simply an "aggravated form of negligence." *Id.* So any plaintiff pleading willful and wanton conduct must "plead and prove the basic elements of a negligence claim," *id.*, plus "a heightened state of mind." *Papadakis*, 2018 IL App (1st) 170388, ¶ 22. Since the Nursing Home Care Act creates liability for negligence, it creates liability for willful

14

and wanton misconduct too. That's why Illinois courts routinely recognize such liability—punitive damages, for example, are available under the Act only when the plaintiff proves willful and wanton misconduct. *See Vincent*, 241 Ill.2d at 499 (right to punitive damages for willful and wanton conduct under Nursing Home Care Act did not survive resident's death); *Eads v. Heritage Enters., Inc.*, 204 Ill.2d 92, 104 (2003) ("[T]he Nursing Home Care Act allows plaintiffs to recover common law punitive damages upon proof of willful and wanton misconduct on the part of defendants."); *Dardeen v. Heartland Manor, Inc.*, 186 Ill.2d 291, 300 (1999) (plaintiffs may recover actual damages and attorney fees upon proof of negligence and punitive damages upon proof of willful and wanton misconduct).

Finally, Westchester notes in reply that neither plaintiff filed a certificate under 735 ILCS § 5/2-622(a), which requires complaints alleging medical malpractice to attach an affidavit from a healthcare professional certifying that a plaintiff's case has merit. Arguments raised for the first time in reply are waived. *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019). And the 735 ILCS § 5/2-622(a) requirement does not apply to claims asserted under the Nursing Home Care Act. *Eads*, 204 Ill.2d at 109. Even if the rule applied, it's a state-law procedural rule, so "a complaint in federal court cannot properly be dismissed because it lacks an affidavit and report under § 5/2-622." *Young v. United States*, 942 F.3d 349, 351 (7th Cir. 2019).

### B. Motion to Strike

A court may—but is not required to—strike from a pleading allegations that are "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f).

Motions to strike are generally disfavored. *Olson v. McGinnis*, 986 F.2d 1424 (7th Cir. 1993); *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989) (motions to strike "potentially serve only to delay"). The court has "considerable discretion" in deciding whether to strike materials in a complaint. *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009).

Westchester moves to strike a number of the allegations in both complaints. Generally, motions to strike should be reserved for removing delay-inducing clutter from a case, and Westchester hasn't shown how the paragraphs at issue prejudice Westchester or threaten to prolong either case. That plaintiffs allege a fact doesn't mean they're entitled to discovery on that fact. And to the extent Westchester seeks to strike background information about prior IDPH citations, those allegations may be relevant to proving punitive damages in Brady's case, and may bear on the question of willfulness in both cases.

I agree with the court's analysis in *Claybon v. SSC Westchester Operating Co.*, No. 20-cv-4507, 2021 WL 1222803, at *6 (N.D. Ill. Apr. 1, 2021), that only three paragraphs in each complaint are so obviously irrelevant and immaterial that they must be stricken from the complaint. Accordingly, paragraphs 19, 26, and 140 of Brady's complaint are stricken, and paragraphs 19, 26, and 116 of Walsh's complaint are stricken. The motions to strike are otherwise denied, for the reasons explained in *Claybon*. *Id.*

## IV.  Conclusion

Westchester's motion to dismiss, [13], is denied. Westchester's answers to the complaints are due May 20, 2021. By April 19, 2021, the parties shall file a status report stating whether there is any objection to consolidating these cases and *Claybon* for discovery. The court will enter a scheduling order after the parties file the status report.

ENTER:

                                                    Manish S. Shah
                                                    United States District Judge

Date:  April 9, 2021