UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EILEEN B. WALSH, as Independent Administrator for the Estate of RITA SAUNDERS,<br><br>   Plaintiff,<br><br>  v.<br><br>SSC WESTCHESTER OPERATING COMPANY LLC, a Foreign Limited Liability Company d/b/a WESTCHESTER HEALTH AND REHABILITATION CENTER,<br><br>   Defendant.<br><br>and<br><br>LONDA CLAYBON, as Independent Administrator for the Estate of CARRIE CLAYBON,<br><br>   Plaintiff,<br><br>  v.<br><br>SSC WESTCHESTER OPERATING COMPANY LLC, a Foreign Limited Liability Company d/b/a WESTCHESTER HEALTH AND REHABILITATION CENTER,<br><br>   Defendant. | No. 20 CV 4505 and<br>No. 20 CV 4507<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

  Rita Saunders and Carrie Claybon, residents of a nursing home owned by defendant SSC Westchester Operating Company, contracted COVID-19 in March 2020. Both died. Plaintiff Eileen Walsh, Saunders's sister, sues Westchester on behalf

of Saunders's estate. Plaintiff Londa Claybon, Carrie Claybon's daughter, sues Westchester on behalf of her mother's estate. Plaintiffs allege that Westchester violated the Illinois Nursing Home Care Act by, among other things, knowingly exposing its residents to nursing staff who had tested positive for, or were displaying symptoms of, COVID-19, and failing to implement policies to mitigate the spread of COVID-19 and treat COVID-19 patients. They bring negligence and willful-and-wanton conduct claims. Defendant filed a motion for judgment on the pleadings, arguing that willful-and-wanton conduct is not a cause of action under the Act, and that Westchester is immunized from suit under the Illinois governor's executive order and the federal Public Readiness and Emergency Preparedness Act. The motion for judgment on the pleadings is denied.

## I. Legal Standards

A party can move for judgment on the pleadings at any time after the pleadings are closed, so long as it's early enough not to delay trial. Fed. R. Civ. P. 12(c). The standard is nearly identical to that for a motion to dismiss; the "only difference…is timing." *See Federated Mut. Ins. Co. v. Coyle Mech. Supply Co.*, 983 F.3d 307, 313 (7th Cir. 2020). I read all facts in the light most favorable to the nonmoving party, but I'm not required to accept facts in the complaint that "undermine plaintiff's claim or to assign any weight to unsupported conclusions of law." *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (citation omitted). I am limited to the pleadings, Fed. R. Civ. P. 12(c), which include the complaint, answer, and "written instruments attached as exhibits." Fed. R. Civ. P. 10(c). Here, that means I can consider the affidavit and exhibits attached to Westchester's

2

answer. [37-1]. *See N. Ind. Gun & Outdoor Shows, Inc.*, 163 F.3d at 452–53. To succeed on the motion, the moving party must "demonstrate that there are no material issues of fact to be resolved." *Federated Mut. Ins. Co.*, 983 F.3d at 313. I cannot allow motions for judgment on the pleadings to "deprive the [plaintiff] of the opportunity to make its case." *Id.*

## II.  Facts

From January to March 2020, the public began to learn about the COVID-19 pandemic. [1-1] ¶¶ 38–72.[1] Illinois's first case was reported on January 24. *Id.* ¶ 44. On March 13, the Centers for Medicare & Medicaid Services issued guidance on infection control and prevention in nursing homes. *Id.* ¶ 55. The guidance directed homes to isolate potentially infected residents; screen all staff for symptoms at the beginning of each shift and, for those who had symptoms, direct them to self-isolate at home; identify and restrict staff who worked at multiple facilities; and obtain supplies as soon as possible. *Id.* On March 17, the Illinois Department of Public Health issued updated guidance for nursing homes; it recommended, among other things, that nursing homes screen residents and staff for fever and respiratory systems. *Id.* ¶ 59.

That same day, the Secretary of the U.S. Department of Health and Human Services issued regulations pursuant to his power under the Public Readiness and Emergency Preparedness Act. 85 Fed. Reg. 15,198. The regulations provided partial

---

[1] Bracketed numbers refer to entries on the *Walsh* district court docket, 20-cv-04505. Bracketed numbers preceded by "*Claybon*" refer to entries on the *Claybon* district court docket, 20-cv-04507. Page numbers are taken from the CM/ECF header placed at the top of filings.

3

civil immunity to health care facilities whose administration of certain COVID-19 countermeasures caused injury or death. *Id.* at 15,198–200. On April 1, the Illinois governor issued an executive order that provides partial civil immunity to nursing homes for deaths and injuries that occur while the nursing homes are "rendering assistance" in connection with COVID-19. [13-5].[2] Plaintiffs sued under the Illinois Nursing Home Care Act, alleging that Westchester's negligence and willful-and-wanton conduct caused decedents' deaths. [1-1] at 21–50; *Claybon* [1-1] at 20–50. Plaintiffs allege that, throughout this period, Westchester failed to implement any policies or procedures to mitigate the spread of COVID-19. *Id.*[3]

Westchester moved to dismiss both suits (as well as a third one not at issue here[4]). [13]; *Claybon* [14]. Westchester's motions were denied, [24]; *Claybon* [27], and both cases were consolidated for pretrial discovery. [27], [28]; *Claybon* [32], [33], [34], [35]. Westchester filed an answer to the complaint, [34]; *Claybon* [37], and moved for judgment on the pleadings, [48]; *Claybon* [56]. The parties' briefs in *Walsh* and *Claybon* are materially identical. *Compare* [48], [51], [52] *with Claybon* [56], [59], [60].

---

[2] As I noted in my opinion denying Westchester's motion to dismiss, I consider this executive order even though it's outside the pleadings. [24] at n.3. Plaintiffs refer to other executive orders in their complaints and they don't object to the court considering any executive order. Further, a court may take judicial notice of public records not subject to reasonable dispute, *Tobey v. Chibucos,* 890 F.3d 634, 647–48 (7th Cir. 2018), and plaintiffs don't dispute the substance of EO 2020-19.

[3] Plaintiffs' version of events, accepted as true at this stage, is covered in detail in the opinions denying defendant's motions to dismiss. [24] at 3–6; *Claybon* [27] at 1–3.

[4] *See* 20-cv-4500, *Brady v. SSC Westchester Operating Co., LLC.*

4

### III. Analysis

At this stage, my legal analysis is limited to the undisputed facts. Westchester says plaintiffs admit that Westchester implemented COVID-19 policies, specifically ([52] at 2–3; *Claybon* [60] at 2–3):

> securing the supply area where personal protective equipment [] was kept; establishing a sign-out system for PPE; educating staff regarding the PPE supply system; securing N-95 respirators; conducting staff and resident training with respect to monitoring for and treating COVID-19, Westchester's PPE supply process, and properly donning and doffing PPE; securing the perimeter of the facility; conducting weekly audits and compliance rounds regarding properly donning and doffing PPE; and establishing stations for tissues, masks, wastebaskets, and hand sanitizer.

Westchester says it was "taking necessary steps to prepare to treat patients with COVID-19" by contracting with SavaSeniorCare Consulting, LLC (one of Westchester's parent companies, according to plaintiffs, [1] ¶¶ 7–9; *Claybon* [1] ¶¶ 7–9) to develop and implement these policies and procedures. [48] at 6–7; *Claybon* [56] at 6–7. Because these facts are undisputed, Westchester says it is entitled to immunity under the Executive Order and PREP Act.[5]

---

[5] *See, e.g.*, [48] at 13–14; *Claybon* [56] at 13–14 ("Plaintiff alleges that [decedent] contracted COVID-19 and died because of Westchester's 'failures in purchasing, providing, maintaining and/or monitoring the numbers of PPE available…. Significantly, Plaintiff *never* asserts that Westchester did not implement the measures described above."); *id.* at 14 ("This is not a case where Plaintiff is alleging that Westchester's nonfeasance caused [decedent's] injuries; rather…Plaintiff takes issue with the way in which Westchester actively administered covered countermeasures."); [52] at 3, *Claybon* [60] at 3 ("These facts [a list of the policies and procedures Westchester says it adopted and implemented] are entirely undisputed. Plaintiff's Complaint contains no factual allegations which would rebut any of the foregoing facts.").

5

But the crux of plaintiffs' argument is that all of those facts are disputed.[6] Because immunity hinges on whether Westchester did what it claims, it would be inappropriate to decide immunity at this stage, plaintiffs say. [51] at 3; *Claybon* [59] at 3. I agree. Defendants can't make the disputed undisputed simply by saying so. "To the extent Defendants want to argue that the PREP Act [and the Executive Order] appl[y], they must do so based on the complaint as it is—not as Defendants would prefer it to be." *Eaton v. Big Blue Healthcare, Inc.*, 480 F. Supp. 3d 1184, 1194 (D. Kan. 2020).

While plaintiffs dispute that Westchester implemented any policies, they concede that Westchester had policies in place. *See* [51] at 3; *Claybon* [59] at 3. But plaintiffs also appear to dispute whether Westchester itself issued those policies, or whether Westchester simply adopted the policies after its parent company, SavaSeniorCare, issued them. *Id.* In sum, I assume only that Westchester had policies; whether they were issued by Westchester itself, let alone implemented, is still disputed.

### A. Willful-and-Wanton Conduct

I rejected defendant's argument that there is no cause of action for willful-and-wanton conduct, [24] at 14–15, and defendant points to no relevant

---

[6] *See* [51] at 3; *Claybon* [59] at 3 ("[A] reflection on the mere existence of purported policies and procedures, without the understanding of how they came about (less whether they were implemented at all), through the discovery process hardly puts the matter into an 'undisputed category.' In fact, and for example, Plaintiff expressly pleaded that Westchester 'fail[ed] to implement ___any___' of the defendant facility's 'isolation and infection control and prevention procedures.'").

change in the law. I reject defendant's argument again for the same reasons as before and Count II stays.

### B. Immunity Under Executive Order 2020-19

Under the Illinois Emergency Management Act, "[a]ny private person, firm or corporation…who renders assistance or advice at the request of the State…during an actual or impending disaster, shall not be civilly liable for causing the death of, or injury to, any person…except in the event of willful misconduct." 20 ILCS 3305/21(c). The Act gives the governor the power to decide when there is a disaster. 20 ILCS 3305/7. Once he's issued a disaster proclamation, he has the power to "make, amend, and rescind all lawful necessary orders, rules, and regulations" to carry out the Act's provisions. 20 ILCS 3305/6(c)(1). On March 9, 2020, the governor issued a disaster proclamation. [13-2]; *Claybon* [14-2]. (A disaster proclamation can be in effect for up to 30 days, 20 ILCS 3305/7, but there is no limit on how many successive proclamations the governor can issue. *Fox Tire Tavern, LLC v. Pritzker*, 2020 IL App (2d) 200623 ¶ 26. Since his first proclamation in March, the governor has issued another twenty-six proclamations. *See* Illinois.gov, *Exec. & Admin. Ords.*, https://www.illinois.gov/government/executive-orders.html (last accessed March 18, 2022)).

On April 1, 2020, the governor issued Executive Order 2020-19, [13-5]; *Claybon* [14-5], activating the immunity provisions of the Emergency Management Act. Section 3 of the executive order provides that, while a disaster proclamation is in

7

effect, health care facilities[7] "shall be immune from civil liability for any injury or death alleged to have been caused by any act or omission by the Health Care Facility" if the injury or death occurred "at a time when a Health Care Facility was engaged in the course of rendering assistance to the State by providing health care services in response to the COVID-19 outbreak," except in cases of "willful misconduct" under 20 ILCS 3305/21. Exec. Ord. 2020-19, § 3. "'Rendering assistance'…must include measures such as increasing the number of beds, preserving personal protective equipment, or taking necessary steps to prepare to treat patients with COVID-19." *Id.*, § 2. This was the operative definition of "rendering assistance" on March 30 and 31, the dates Carrie Claybon and Rita Saunders died, respectively. [1-1] ¶ 2; *Claybon* [1-1] ¶ 2.

Westchester says it is immune from civil liability under the executive order because it issued and implemented various COVID-19 policies by contracting with SavaSeniorCare Consulting, LLC. [48] at 2, 4, 6–7; *Claybon* [56] at 2, 4, 6–7; [52] at 2–3; *Claybon* [60] at 2–3. Westchester says this qualifies as "taking necessary steps to prepare to treat patients with COVID-19." [48] at 6–7; *Claybon* [56] at 6–7. Westchester also says it was preserving PPE, [48] at 5–6; *Claybon* [56] at 5–6. But again, plaintiffs dispute that Westchester issued and implemented policies and was

---

[7] Section 1 of the Executive Order incorporates the Illinois administrative code's definitions of "health care facilities," including "skilled and intermediate long term care facilities licensed under the Nursing Home Care Act" and "nursing homes…maintained by the State or any department or agency thereof." Ill. Admin. Code tit. 77 § 1130.215(b), (f). *See* Exec. Ord. 2020-19 § 1(a)(i). The parties don't dispute that Westchester is a health care facility under the order.

preserving PPE; plaintiffs concede only that Westchester had policies. [51] at 3; *Claybon* [59] at 3.

To my knowledge, no state or federal cases have addressed the scope of "taking necessary steps to prepare to treat patients with COVID-19."[8] Whether the mere existence of policies amounts to "rendering assistance" requires factual development. Westchester argues that the question is a matter of legal interpretation of the words of the executive order, [48] at 5; *Claybon* [56] at 5; [52] at 3; *Claybon* [60] at 3, and says implementing a plan to care for patients was a necessary step, but its brief does not explain why these specific policies were "necessary" for it to treat patients, [48] at 6–7; *Claybon* [56] at 6–7. Understanding the facts around the policies' role in patient care at Westchester's facilities would inform how Westchester's conduct applies to the executive order. That is reason enough to deny a motion for judgment on the pleadings. Another open question is whether Executive Order 2020-37's definition of "rendering assistance" is applicable to Executive Order 2020-19's definition. Yet another is whether the executive order only immunizes claims where the injury and rendered assistance are causally related. *See* [51] at 3–5; *Claybon* [59]

---

[8] This isn't surprising, since this definition of "rendering assistance" was in place for only two months. On May 13, 2020, the governor issued Executive Order 2020-37, which established a new baseline definition of "rendering assistance." Exec. Ord. 2020-37, § 2. It provides that "'[r]endering assistance'…must include measures such as increasing the number of beds, preserving and properly employing personal protective equipment, conducting widespread testing, and taking necessary steps to provide medical care to patients with COVID-19 and to prevent further transmission of COVID-19." *Id.* § 2(1). It "must also include, consistent with current guidance and recommendations from IDPH[,] (1) conducting widespread testing of residents and widespread and regular testing of staff for COVID-19, and (2) accepting COVID-19 patients upon transfer or discharge from a Hospital or Health Care Facility." *Id.* § 2(1)(4).

9

at 3–5; [52] at 6–7; *Claybon* [60] at 6–7. But if Westchester was not rendering assistance at all, or if Westchester engaged in willful misconduct, then the causal-connection issue and the interpretive challenges surrounding the phrasing of a short-lived emergency executive order become academic. A developed factual record will sharpen the lines in the parties' dispute and allow for a complete analysis of Westchester's immunity defense.

### C.  Immunity Under the PREP Act

Defendant argues that even if it's not immunized by the governor's executive order, it's immunized by the federal Public Readiness and Emergency Preparedness (PREP) Act. [48] at 12–15; *Claybon* [56] at 12–15; [52] at 9–13; *Claybon* [60] at 9–13. Plaintiffs, in turn, argue that the Act only covers entities involved in the "administration" or "use" of covered countermeasures—in other words, defendants that have taken action. [51] at 9–13; *Claybon* [59] at 9–13. Because plaintiffs' theory is that defendant's *inaction* caused deaths and sickness, plaintiffs say the PREP Act doesn't immunize defendant.

#### 1.  Background

The PREP Act, enacted in 2005, partially shields from liability providers of "covered countermeasure[s]" during public health crises. 42 U.S.C. §§ 247d-6d, 6e. The Act gives the Secretary of Health and Human Services the authority to declare a public health emergency and recommend the "manufacture, testing, development, distribution, administration, or use" of certain countermeasures, as defined by the Secretary. 42 U.S.C. § 47d-6d(b)(1). Once the Secretary has declared an emergency, covered entities are no longer liable under federal or state law for "loss caused by,

10

arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." 42 U.S.C. § 247d-6d(a)(1). Although victims cannot sue covered entities for negligently deploying countermeasures, victims can file for compensation from the Covered Countermeasure Process Fund. 42 U.S.C. §§ 247d-6e(a)–(b)(1). As with the governor's executive order, there's an exception for willful misconduct. 42 U.S.C. § 247d-6d(d)(1).[9] Any willful-misconduct claim must be brought in the District Court for the District of Columbia. 42 U.S.C. § 247d-6d(e)(1).

On March 17, 2020, the Secretary of Health and Human Services declared a public health emergency, triggering immunity under the Act. *See* 85 Fed Reg. 15,198. The Declaration defines covered countermeasures as "any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19," its transmission, or the transmission of a COVID-19 mutation. *Id.* at 15,202. Though published in the Federal Register in March, the Declaration states that it became effective on February 4, 2020. *Id.* at 15,198. The Secretary has since issued ten amendments to the original declaration, *see* 87 Fed. Reg. 982–83, though the first of those amendments was issued after Claybon and Saunders died.

    2.    *"Administration" of covered countermeasures*

Similar to the executive-order analysis, the question here is whether issuing COVID-19 policies (or receiving policies issued by a parent company) counts as

---

[9] Willful misconduct is defined as "an act or omission that is taken—(i) intentionally to achieve a wrongful purpose; (ii) knowingly without legal or factual justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit." 42 U.S.C. § 247d-6d(c)(1)(A).

11

"administration" of a covered countermeasure, even if the policies are never implemented. But compared to the executive order's definition of "rendering assistance," HHS's regulations and advisory opinions more clearly define "administration" of covered countermeasures. *See* 85 Fed. Reg. 15,200, 15,202, 79,197; Advisory Op. 20-04 at 6, 7 (Oct. 22, 2020; modified Oct. 23, 2020).

The Act itself does not define "administration" or "use" of a covered countermeasure; it leaves the Secretary to "provide relevant conditions" in declarations he issues. 85 Fed. Reg. 15,200. At the time Claybon and Saunders died, the Secretary defined "administration" as "physical provision of the countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution, and dispensing of the countermeasures to recipients; management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures." *Id*. Further, "'administration' extends only to physical provision of a countermeasure…such as vaccination or handing drugs to patients, and to activities related to management and operation of programs and locations for providing countermeasures to recipients, such as decisions and actions involving security and queuing, but only insofar as those activities directly relate to the countermeasure activities." *Id.*

In cases similar to this, courts across the country have considered whether the PREP Act covers claims of inaction.[10] These courts distinguish between misfeasance and nonfeasance and maintain that the Act "is designed to protect those who employ countermeasures, not those who decline to employ them." *See, e.g.*, *Est. of Maglioli*, 478 F. Supp. 3d at 531; *Mackey*, 2021 WL 5050292, at *3 (quoting *Maglioli*); *Martin*, 2021 WL 4313604, at *3 (same); *Ruiz*, 2021 WL 3056275, at *2 (same); *Dupervil*, 516 F. Supp. 3d at 255–56 (noting a "growing consensus among courts across the country" that state-law claims for failure to protect are not covered by the PREP Act because they involve nonfeasance as opposed to misfeasance). That distinction makes sense. Congress chose active words—"administration," "use," *see, e.g.*, §§ 247d-6d(a)(1), (a)(2)(B), (b)(2)(A)—and the Secretary similarly wrote of active "provision," "management," and "operation," *see, e.g.*, 85 Fed. Reg. 15,200, 15,202. And while decision-making could lead to inaction, the covered decision-making must relate directly to the action of delivery, distribution, or dispensing countermeasures.

---

[10] *See, e.g.*, *Mackey v. Tower Hill Rehab., LLC*, ___ F. Supp. 3d ___, 2021 WL 5050292 (N.D. Ill. 2021); *Ruiz v. ConAgra Foods Packaged Foods, LLC*, No. 21-CV-387-SCD, 2021 WL 3056275 (E.D. Wis. July 20, 2021) (meatpacking plant); *Martin v. Petersen Health Operations, LLC*, No. 20-cv-1449, 2021 WL 4313604 (C.D. Ill. Sep. 22, 2021); *Est. of Maglioli v. Andover Subacute Rehab. Ctr. I*, 478 F. Supp. 3d 518 (D.N.J. 2020), *affirmed by Maglioli v. All. HC Holdings LLC*, 16 F.4th 393 (3d Cir. 2021); *Eaton v. Big Blue Healthcare, Inc.*, 480 F. Supp. 3d 1184 (D. Kan. 2020); *Sherod v. Comprehensive Healthcare Mgmt. Servs., LLC*, 20-cv-1198, 2020 WL 6140474 (W.D. Pa. Oct. 16, 2020); *Brown v. Big Blue Healthcare, Inc.*, 480 F. Supp. 3d 1196 (D. Kan. 2020); *Rodina v. Big Blue Healthcare, Inc.*, 20-cv-2319-HLT-JPO, 2020 WL 4815102 (D. Kan. Aug. 19, 2020); *Baskin v. Big Blue HealthCare, Inc.*, 20-cv-2267-HLT-JPO, 2020 WL 4815074 (D. Kan. Aug. 19, 2020); *Anson v. HCP Prairie Vill. KS OPCO LLC*, 523 F. Supp. 3d 1288 (D. Kan. 2021); *Dupervil v. All. Health Operations, LLC*, 516 F. Supp. 3d 238 (E.D.N.Y. 2021); *Lyons v. Cucumber Holdings, LLC*, 520 F. Supp. 3d 1277 (C.D. Cal. 2021); *Est. of Jones v. St. Jude Operating Co., LLC*, 20-cv-01088-SB, 2020 WL 8361924 (D. Or. Oct. 14, 2020); *Parker ex rel. Parker v. St. Jude Operating Co.*, 20-cv-01325-HZ, 2020 WL 8362407 (D. Or. Dec. 28, 2020); *Leroy v. Hume*, ___ F. Supp. 3d ___, 2021 WL 3560876 (E.D.N.Y. 2021).

Finally, the context of the statute and regulations supports the distinction between action and inaction. Protection against liability is meant to encourage action against the virus, specifically the production and deployment of countermeasures. *See Assessing the Nat'l Pandemic Flu Preparedness Plan: Hearing Before the Comm. on Energy & Commerce*, 109th Cong. 20 (2005) (statement of Michael O. Leavitt, Secretary, U.S. Department of Health and Human Services) ("[A]s we seek to build domestic [vaccine] manufacturing capacity, we also know that the threat of liability exposure is too often a barrier to willingness to participate in the vaccine business….[T]he Administration is proposing limited liability protections for vaccine manufacturers and providers."); Cong. Rsch Serv., LSB 10443, The PREP Act & COVID-19: Limiting Liability for Medical Countermeasures (Jan. 13, 2022) (PREP is intended "[t]o encourage the expeditious development and deployment of medical countermeasures during a public health emergency"). So I agree with those courts that read the Act and relevant regulations to exclude inaction from its coverage.

Plaintiffs say Westchester did nothing. That is, their claims "are based on what Defendant[] failed to do to stop the entry and spread of COVID-19 at [Westchester], not on [the] improper administration or misuse of any specific COVID-19 drug, vaccine, test kit, PPE, or other covered countermeasure." *Est. of Jones*, 2020 WL 8361924, at *10; *see Baskin*, 2020 WL 4815074, at *6 ("[N]owhere in the complaint do Plaintiffs suggest that the decedent's death was causally connected to the administration or use of any drug, biological product, or device…. The claim seems to be precisely the opposite: that inaction rather than action caused the death."). Here,

14

plaintiffs don't allege that defendant did something wrong; they allege that defendant did nothing.

In response, Westchester points to HHS Advisory Opinion 2021-01 to argue that non-use of covered countermeasures that is the result of "conscious decision-making" triggers immunity. [48] at 14; *Claybon* [56] at 14. But the advisory opinion makes this point in reference to an example where a covered entity with limited vaccine supply chooses to vaccinate a person in a vulnerable population instead of a person in a less vulnerable population. Advisory Op. 2021-01 at 3 (Jan. 8, 2021). Granted, the opinion also says that "[t]here can potentially be other situations where a conscious decision not to use a covered countermeasure could relate to the administration of the countermeasure." *Id.* But it also says, "[i]n contrast, the failure to purchase any PPE, if not the outcome of some form of decision-making process[,] may not be sufficient to trigger the PREP Act." *Id.* Westchester says its policies were "the result of conscious decision-making," [48] at 13; *Claybon* [56] at 13—the implication is that even if Westchester purchased no PPE (which they dispute), that exemption to immunity wouldn't apply.

This takes the language out of context. The sentence comes immediately after a discussion about health care facilities making difficult decisions about how to allocate resources when there aren't enough to go around. Advisory Op. 2021-01 at 3. The picture plaintiffs paint—of Westchester simply not bothering to purchase or deploy any PPE—is not that scenario. What's more, the advisory opinion makes clear that the Act "itself supports a distinction between allocation which results in non-use

15

by some individuals, on the one hand, and nonfeasance, on the other hand, that also results in non-use." *Id.* at 4.[11]

Finally, even if the parties agreed that Westchester took some countermeasures somewhere in the facility, that wouldn't be "sufficient to invoke the [] Act as to all claims that arise in that facility." *Brown*, 480 F. Supp. 3d at 1206; *Dupervil*, 516 F. Supp. 3d at 255. Take, for instance, a nursing home that distributed N-95 masks but failed to administer vaccines. The facility would be hard-pressed to argue that it's immunized from vaccine-related claims because it distributed N-95s. PREP's immunity provision requires a causal connection between the injury and the use or administration of covered countermeasures. 42 U.S.C. § 247d-6d(a)(2)(B). Even if, for instance, Westchester trained staff to don and doff PPE (a disputed fact), plaintiffs could still argue that failure to take other precautions caused their family members' deaths. (The factual question of causation would then be up to a jury.)

In sum, plaintiffs can bring a willful-and-wanton conduct claim; defendant is not entitled to immunity under the PREP Act; and, at this stage, the facts aren't sufficiently developed to decide whether defendant is entitled to immunity under the governor's executive order.

---

[11] Even assuming the advisory opinion means what Westchester says, I am not bound by it, as other courts have pointed out. *See Mackey*, 2021 WL 5050292, at *5; *Leroy*, 2021 WL 3560876, at *5; *Dupervil*, 516 F. Supp. 3d at 252. Department opinions, unlike regulations or administrative adjudications, are not entitled to *Chevron* deference. *Graham v. Bd. of Educ.*, 8 F.4th 625, 628 (7th Cir. 2021).

## IV. Conclusion

Defendant's motion for judgment on the pleadings, *Walsh* [48]; *Claybon* [56], is denied.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: March 22, 2022